**UNITED STATES of America, Plaintiff,**

v.

**Laurence KEISWETTER, Defendant.**

Crim. A. No. 86–10125–01.

United States District Court,
D. Kansas.

Jan. 17, 1989.

---

Robin Fowler, Asst. U.S. Atty., Wichita, Kan., for plaintiff.

Michael Harris, Kansas City, Kan. (Court-appointed), for defendant.

## OPINION AND ORDER

THEIS, District Judge.

This matter comes before the court following remand from the Tenth Circuit Court of Appeals. The Tenth Circuit remanded the case for clarification of this court's reasons for finding that a factual basis existed for the charge of conversion of property to which the defendant pleaded guilty. The Tenth Circuit instructed the court to enter written findings and certify those findings as a supplement to the record on appeal.

The defendant had entered into an agreement with the government in which he agreed to plead guilty to a misdemeanor charge of conversion in exchange for the dismissal of the original felony charge of conversion. The property that the defendant allegedly converted was cattle which had been mortgaged to the Production Credit Association of Stockton, Kansas (PCA). Shortly after the defendant entered his guilty plea pursuant to *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), he moved to withdraw his plea. At the sentencing hearing, the court denied the defendant's motion to withdraw his guilty plea. It is from this denial that the defendant appeals.

The Tenth Circuit's remand order essentially ordered this court to specify what

matters the court considered in determining that a factual basis existed for the plea. This court did not hold any further proceedings, but instead has considered solely those matters which were before it at the time of the defendant's plea and sentencing. Those items are: the Presentence Report (attached to this opinion as Exhibit A); the Petition to Enter Plea of Guilty; and the actual transcripts of the plea and sentencing hearings.

The Petition to Enter Plea of Guilty, which the panel quoted in its opinion, contains the defendant's sworn statement: "THAT ON OR ABOUT MARCH 22, 1984, IN THE DISTRICT OF KANSAS, I DID, WITH THE INTENT TO DEFRAUD, KNOWINGLY AND INTENTIONALLY CONCEAL, DISPOSE OF OR CONVERT TO MY OWN USE, PROPERTY OF A VALUE LESS THAN $100.00, WHEN SAID PROPERTY WAS MORTGAGED OR PLEDGED AS COLLATERAL, IN VIOLATION OF 18 U.S.C. SECTION 658." This sworn statement contains the defendant's admission that he converted the cattle, which had been pledged as collateral, with the requisite intent to defraud.

The court also considered the material contained in the Presentence Report, specifically the government's and the defendant's versions of the offense. The government's version, at pp. 1–2 [see appendix, pp. 1467–1469], begins with a recitation of the defendant's dealings with the PCA, including the July 1983 loan and security agreement at issue here. The defendant applied for and received a loan in the amount of $22,764. As collateral, the defendant pledged, among other items, some cattle. The PCA learned in March 1984, that the defendant had sold this cattle. Pursuant to the security agreement which the defendant had signed, any proceeds from the sale were to be paid to the PCA. The defendant received a check for $13,-133.96 as the proceeds from the sale of the pledged cattle. The defendant's endorsement was present on the check. The money was deposited in the defendant's personal bank account.

The defendant's version of the offense, at pp. 3–6 of the Presentence Report [see appendix, pp. 1469–1471], reflects the defendant's views as to the illegality of the PCA. The defendant also summarized his dealings with the PCA, including his belief that the PCA breached its fiduciary duties and caused impossibility of performance by its failure to extend further credit to him. The defendant alleges other misconduct on the part of the PCA, including alleged breaches of contract and violations of the Truth in Lending Act. The defendant also refers to a civil case filed in state court by the PCA and defendant's inability to reach a settlement in that case. The court notes that the defendant never addressed the elements of the offense to which he pleaded guilty. The defendant never denied the key background facts: signing the loan documents and the security agreement, knowledge of the provisions of those instruments, pledging the cattle as collateral, receiving and using the proceeds of the loan from the PCA, selling the cattle, or keeping the proceeds in violation of the security agreement. Further, the defendant never asserted that he had authority to sell the collateral. The defendant asserted that because the PCA filed suit against him, he had the right to keep the collateral.

The matters presented at the plea hearing also provide factual support for the court's acceptance of the plea. Throughout the plea hearing, the defendant raised issues which were not relevant to the criminal charge. The transcript of the plea hearing includes a lengthy discussion of the defendant's contentions regarding the legality of the PCA. The defendant's attorney, Mr. Harris, advised the defendant that the PCA's status as a corporation was not invalidated by repeal of the relevant statute, because of a savings clause. Counsel stated further that he and the defendant disagreed on this point. Plea Tr. p. 11, 1.7 through p. 17, 1.25. Mr. Harris was the defendant's choice for court-appointed counsel, having been involved in the ongoing civil litigation between the defendant and the PCA.

The defendant expressed his concern that he was being selectively prosecuted,

that the PCA used the criminal charge to dispose of the ongoing civil case, and that the PCA was itself guilty of conversion. Plea Tr. p. 19, 1.4 through p. 20, 1.17. The defendant further expressed his opinion that the criminal charge was retaliatory. Plea Tr. p. 23, 11.13–16. Defense counsel discussed negotiations with the PCA on the civil matter as well as his legal opinion that the civil proceedings and criminal charge were completely separate. Plea Tr. p. 25, 1.6 through p. 27, 1.14.

The defendant stated that the criminal proceedings had become costly, even though he had appointed counsel, and that he was "sick and tired of the whole mess." Plea Tr. p. 24, 11.1–5. The defendant expressed his intention to proceed with the plea. Plea Tr. p. 28, 11.12–14.

The transcript of the sentencing hearing provides further factual support for the guilty plea. The defendant stated that he entered the guilty plea to gain an advantage in the civil litigation with the PCA. His inability to resolve the civil matter with the PCA led to the defendant's motion to withdraw his plea. Sentencing Tr. p. 6, 1.14 through p. 8, 1.6; p. 8, 1.9 through p. 9, 1.9. The court pointed out several times that the civil and criminal cases were separate (Sentencing Tr. p. 9, 11.14–18; p. 12 11.19–22; p. 16, 11.13–17), but the defendant insisted that the criminal charge was conditioned on the outcome of the civil case. Sentencing Tr. p. 12, 11.14–18; p. 12, 1.23 through p. 13, 1.2; p. 16, 11.7–12.

 During the plea and sentencing hearings, the defendant never denied the background facts. He signed the security agreement. That instrument provided that if he sold the collateral he could not keep the proceeds. He sold the collateral but did not remit the proceeds to the PCA. Instead, the money was traced to his personal bank account. These facts are sufficient to establish that the crime of conversion occurred. The defendant never challenged the existence of these facts. The sole basis for his motion to withdraw his plea and his continuing protestations of innocence was the defendant's erroneous view of the law.

The defendant requested that Mr. Harris be appointed to represent him. The court then appointed Mr. Harris in place of the defendant's original appointed attorney. The transcript excerpts cited above reflect the legal advice which Mr. Harris gave to the defendant. The defendant neither believed nor followed his attorney's advice. The defendant also did not believe the court when the court repeatedly told him that the criminal and civil cases were entirely separate.

The defendant briefly asserted in the Presentence Report that he sold the cattle on the advice of counsel. This brief allegation was insufficient to show that he fully disclosed the facts to his attorney and relied in good faith on the attorney's advice. Mr. Harris admitted at the plea hearing that the defendant would not accept his legal advice. Plea Tr. p. 12, 1.9 through p. 13, 1.11; p. 15, 11.1–2 & 1.13 through p. 16, 1.6. Based on the defendant's statements in the Presentence Report and in court at the hearings, the court concluded that the defendant was not credible and that the requisite intent to defraud was present from the overall evidence and the defendant's own statements. While the court was sympathetic with the problems the defendant said he had encountered with the PCA, the court concluded that those problems were either caused or exacerbated by the defendant's erroneous interpretation of the law applicable to the PCA.

The above shall constitute the written findings pursuant to the partial remand order. These findings with the attached Presentence Report and the referenced portions of the two transcripts shall constitute a supplement to the record on appeal.

IT IS SO ORDERED.

## EXHIBIT A

PROB 2
(Rev. 4/84)

### UNITED STATES DISTRICT COURT
### DISTRICT OF KANSAS

### PRESENTENCE REPORT

| NAME (Last, First, Middle) | | | DICTATION DATE | |
|---|---|---|---|---|
| KEISWETTER, Laurence Lee | | | 08/19/87 | |

| ADDRESS | LEGAL RESIDENCE | SCHEDULED SENT. DATE |
|---|---|---|
| 607 West Wilberforce Box 105 Norton, Kansas 67654 Phone: 913-877-2466 | Same | 08/28/87 |
| | | DOCKET NO. 86-10125-01 |
| | | CITIZENSHIP United States |

| AGE | RACE | DATE OF BIRTH | PLACE OF BIRTH | SEX | EDUCATION |
|---|---|---|---|---|---|
| 56 | Caucasian | 09/03/30 | Densmore, Kansas | Male | College Graduate |

| MARITAL STATUS | DEPENDENTS | SOC. SEC. NO. |
|---|---|---|
| Divorced | None | 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 |

| FBI NO. | U.S. MARSHAL NO. | OTHER IDENTIFYING NO. |
|---|---|---|
| | 03277-031 | KS D.L. F2A8R2 |

**OFFENSE**
86-10125-01: UNLAWFUL DISPOSAL OF MORTGAGED PROPERTY, in violation of 18 U.S.C. 658 (misdemeanor), Count I of a Superseding Information.

**PENALTY**
86-10125-01: One year and/or $1,000 fine. Restitution is applicable under 18 U.S.C. 3651.

| CUSTODIAL STATUS | DATE OF ARREST |
|---|---|
| At liberty by $5,000 OR bond posted 11/06/86. | 11/06/86 |

**PLEA**
Pled guilty on 07/09/87 to a Superseding Information in case number 86-10125-01 but did not admit guilt by virtue of plea based on North Carolina versus Alford, 400 U. S. 25 (1970).

**VERDICT**
N/A

**DETAINERS OR CHARGES PENDING**
None.

**OTHER DEFENDANTS**
None.

| ASSISTANT U.S. ATTORNEY | DEFENSE COUNSEL |
|---|---|
| Robin Fowler 306 U. S. Courthouse Wichita, Kansas 67202 | Michael Harris (Appointed) 812 North Seventh Street, Suite 408 Kansas City, Kansas 66101 (Phone: 913-236-3712) |

**DISPOSITION**
CAG one year. ESS, probation five years, pursuant to 18 U.S.C. 3651. $13,133.96 restitution to the Clerk of the U. S. District Court for disbursement to Farm Credit Center, Central Kansas, 719 East Crawford, P. O. Box 977, Salina, Kansas, 67402-0977.

| SENTENCING JUDGE | DATE | PROBATION OFFICER |
|---|---|---|
| Honorable Frank G. Theis | 08/28/87 | Gary Howard |

Laurence Lee Keiswetter
Presentence Report
[Page 1]

## OFFENSE:

Laurence Keiswetter was originally indicted on 10/28/86 and charged with one count of unlawfully disposing of collateral (35 cattle) mortgaged to the Production Credit Association at Stockton, Kansas, in violation of 18 U.S.C. 658.

A Superseding Information in case number 86–10125–01 was filed by Assistant U.S. Attorney Robin Fowler charging Laurence Keiswetter with one count of disposing or converting mortgaged property with a value of less than $100 on or about 03/22/84. This property had been previously pledged to the Production Credit Association of Stockton, Kansas, according to the Superseding Information.

On 07/09/87 Laurence Keiswetter entered an "Alford" plea of guilty to the following misdemeanor offense:

UNLAWFUL DISPOSAL OF MORTGAGED PROPERTY,
Count I of 86–10125–01.

### Prosecution's Version:

The U.S. Attorney's Office submitted the following written statement with regard to this offense:

"The facts of this case, as derived from agents' reports, are as follows:

The defendant was a member of the PCA of Stockton, Kansas, in 1975 when he first received a loan from them. His indebtedness with the PCA rose to $112,000 in 1982, but was reduced to approximately $18,000 in 1983.

On July 19, 1983, the defendant applied for a new loan from the PCA and filed a financial statement to support his loan application. Based on this application and financial statement, a loan for $22,764 was approved to be due July 15, 1984. This was over and above the $18,000 already owed. The defendant pledged security valued at approximately $60,000 for this loan: $41,535 in machinery; $11,350 in livestock; and $7,490 worth of cash crops. PCA Vice–President Benny Leighton said that the defendant also gave the PCA a first mortgage on 90 acres of grassland, but it was later discovered that the land was mortgaged to the Federal Land Bank. The PCA therefore had a second mortgage.

In early November, 1983, the defendant sued the PCA and Vice–President Leighton for $1,000,000 apiece. According to Leighton the lawsuit was pro se, and contained what he described as typical Posse Comitatus language. At this time the loan was not in default, and the PCA was not aware of any improper activities by the defendant.

[Page 2]

During March of 1984, Leighton learned that the defendant had apparently sold both cattle and grain which PCA had an interest in. The cattle and grain in question had been pledged to the PCA pursuant to a July 22, 1983, security agreement. Based on this security agreement, the proceeds of this property, if sold, were to go to the PCA. Leighton discovered that the defendant sold $3,003.64 worth of stored grain on December 30, 1983, and sold $13,133.96 worth of cattle on March 22, 1984 (paid in checks). All payments described above were made payable in checks to the defendant, and his endorsement was present on each check. All the money was deposited in the defendant's personal bank account.

On June 6, 1984, Vice–President Leighton wrote a letter to the defendant advising him that the $16,137.60 in proceeds the defendant received from the sale of cattle and grain, pledged to the PCA, had not been received by the PCA. According to Leighton, the defendant did not answer the letter.

The defendant, based on the loan agreement described earlier, owed the PCA approximately $22,176.79 as of June 6, 1984 (the original $18,000 plus approximately $4,000 in extensions of additional credit). When payment was not made on this debt, the PCA attempted to foreclose on what property the defendant had pledged to the PCA. The foreclosure case was set for trial on August 19, 1985. The defendant filed a Chapter 11 bankruptcy on August 16, 1985, effectively halting the foreclosure proceedings. As of May 19, 1987, PCA records show that the defendant has $28,570.36 in outstanding debts. The foreclosure and bankruptcy matters are still pending."

**Pretrial Services and Plea Agreement:**

Laurence Keiswetter was arrested on 11/06/86 and thereafter received by the U.S. Marshal's Office for processing. On that same day he appeared before U.S. Magistrate John B. Wooley and after posting an unsecured bond in the amount of $5,000 he was ordered released after processing.

On 11/12/86 Laurence Keiswetter again appeared before U.S. Magistrate John B. Wooley, represented by court appointed counsel Kiehl Rathbun for arraignment and plea and after receiving an explanation of his constitutional rights, he then entered a plea of not guilty to the Indictment in 86–10125–01.

A motion for extension of time and court to appoint another legal counsel was then submitted and filed by Laurence Keiswetter on 12/08/86. An order granting continuance and a new attorney (Michael Harris) was so ordered and granted by U.S. District Court Judge Frank G. Theis on 12/17/86.

[Page 3]

**OFFENSE:**

On 05/26/87 a motion for continuance was presented to the court by defense counsel Michael Harris and the minute order was entered continuing this matter on the criminal trial docket for 06/30/87.

A Superseding Information in case number 86–10125–01 was then filed by Assistant U.S. Attorney Robin Fowler on 07/09/87 charging Laurence Keiswetter with the misdemeanor offense of disposing of property (with a value of less than $100) that was already mortgaged or pledged to the Production Credit Association of Stockton, Kansas. On this same date, Laurence Keiswetter appeared before the Honorable Frank G. Theis for a change of plea and entered a plea of guilty to this one-count Superseding Information and it should be noted that this plea was based on **North Carolina versus Alford,** 400 U.S. 25 (1970). A presentence investigation was then ordered by the court. A plea agreement was entered into between the defendant and the government and pursuant to this plea agreement and in exchange for a plea to Count I of the Superseding Information, the government will dismiss the original Indictment at the time of sentencing.

**Victim Impact Statement:**

Participation in a criminal act of this nature serves to undermine the financial integrity of both the local community and the Production Credit Association of Stockton, Kansas. Additionally, the government has pointed out that although the financial relationship between the defendant and the victimized PCA is quite complicated, the government still believes that the PCA was victimized by the unlawful conversion of proceeds by the defendant and therefore requests that restitution of $13,133.96 be paid to the Farm Credit Center of Central Kansas at 719 East Crawford, P.O. Box 977, Salina, Kansas, 67402–0977.

**Defendant's Version:**

Laurence Keiswetter has discussed his involvement in this matter at length with writer and has indicated that he doesn't feel like he did anything wrong with regard to this case. However, he further indicated that if he were able to do it all "over again" he would have "put the proceeds" (from the sale of the cattle) "into escrow". He did point out as well that the moneys received from the sale of the cattle were later deposited in the Plateville State Bank and were consumed through "the normal course of his farming business".

Writer did give Laurence Keiswetter the opportunity to provide a written version of his accounting of this offense and it is presented as follows:

[Page 4]

"1972 Stockton Production Credit Association loan committe (sic) checked out my operation and agreed to extend a line of credit of $120,000.00. The previous lendor (sic) would only extend credit of approximately $40,000.00.

From 1972 until 1980 the operation was expanded with approval and the maximum loan was some $385,000.00. Guaranteed loan with (?) & PCA about 1975.

The PCA called the loan Nov. 1982 and demanded that operation of livestock & grain for full repayment. This started the problems which were address by a letter in regards to PCA's breach of fiduciary trust and subsequent liability.

The PCA did later review, July 1983, which clearly showed breach of fiduciary trust by liquidating when not necessary. The PCA then started creating impossbility (sic) of performance by failure to extend credit to maintain a functional operation. The contract was breached in September and November by refusal to extend credit, payment of fertilyzer (sic) (lawsuit), redeem wheat from CCC (lawsuit resulted which allowed me to sell without prepayment). Past dealings from Nov. 1982 were very obvious as to what to expect, forced liquidation by creating impossibility of performance.

The transaction between PCA & Laurence Keiswetter has serious legal problems as to perfection (never filed with Sec. of State). Also, the 90 acres was not part of renewal (documents will show) and PCA had full knowledge because they ran title search & illegally charged me (filing and title search).

Their lawsuits filed Oct. 31, 1983 was essentially violation of Truth in Lending Act which created statutory remedees (sic), the right of recession (sic) & cetra. An attorney informed me to file notice of recession (sic) motion to counsel recession (sic) and then 20 days later (?) file motions of default judgment. These pleadings were duly filed by December 1983, therefore procedurally this granted me the right to my property. The amended complaint set forth more alleged violations—stock (?)—not registered—lack of consideration (money versus credit) & others.

Bankruptcy was filed Aug. 1985 and the alleged PCA filed a reclamation complaint for conversion and later instructed as to non dischargable (sic) debt. To continue with federal actions shows malacious (sic) or selective prosecution. Either litigation could have resolved this dispute. The counter claim filed is a complete defense in it self and proceedings had established facts to sustain.

[Page 5]

Bankruptcy proceedings will clearly show misrepresentation of the entity of SPCA that I did business with and subsequently change names to various entities. First claimed unsecured to get adequate protection payment and later claimed oversecured, with purpose of showing plan not feasible to get the bankruptcy dismissed.

Good faith attempts (hired consultant) have been made to negotiate a settlement and the so called entities of SPCA and/or (?) of PCAS, FCS, FICBW, Capitol Corporation, Ninth Dist PCA or Special Asset Groups with certain representative are not willing to negotiate in Good Faith, only want a criminal conviction, usage of a federal court for debt collection, malacious (sic) prosecution and for a private entity. Question of standing in any court for failure to comply with statute, 12 USC 2258—registration, stock, prospective.

What I would do different is to put the proceeds from livestock in an escrow account & settled by litigation.

Restitution: I feel should be subjected to bankruptcy proceedings or negotiating out an amount acceptable in satisfaction of total obligations. Furthermore, Michael Harris advised me that his professional opinion was that no restitution would be required as money was used in business payment of of taxes, insurance & cetra & to be settled in civil actions.

I have been penalized from Oct 28, 1986 (indictment without rep.) or from arrest of 11–5–86 (2) court appointed counsels have been assigned without either defending Mr. Harris requested time & did nothing in my behalf. My freedom (time) has been taken away by the system and has become cost prohibitive —either trips to Wichita, Topeka or Kansas City and nothing done to defend in my behalf. Guilty prior to conviction.

Additional circumstances that show no adequate defense is that the Honorable Judge Frank Theis stated at the Alford hearing that the penalty would be the same whether plea was accepted or defendant was convicted @ trial. What advantage to plea & with pending litigation? Don't sound logical to advise a plea!

Member of Posse C:

The definition out of Black Law Dictionary is very precise and relates back to the US Constitution; therefore any other so called definition is out of context, biography as well shows some senister (sic) attack on the constitution of the United States.

[Page 6]

I would like the new, revised version for definition of Posse C.

No, I do not belong or I am I a member of same Radical Posse.

The insinuation of Posse as relation to me is because I have tried to seek redress of grievence (sic) in court violation of laws by a self serving, self seeking, entity that is private, a quashi (sic) corporation no duly filed charter, only a Trade Mark which is contrary to the Public Policy. Why not make a private entity called Farm Credit Services pay taxes like any other private business. Title 12 USC of 2558 is clear and the landmark case of Colorado vs Federal Land Bank of Wichita required payment of taxes! What is wrong with the State of Kansas?

*PRIOR RECORD:*

Laurence Keiswetter has conveyed the following record of arrest to writer:

| Date | Offense | Place | Disposition |
|---|---|---|---|
| 1958 (Age 28) | DWI | Douglas County, Kansas. | Fined $100 with a suspended driver's license. |
| 1960 (Age 30) | DWI | Wynne, Arkansas. | Dismissed. |
| 1961 (Age 31) | DWI | Norton, Kansas. | Dismissed. |

Writer has conducted arrest record inquiries with appropriate law enforcement agencies including the FBI, KBI, Driver's Control Bureau, Norton County Sheriff's Office, Arkansas State Police and Cross County Sheriff's Office in Wynne, Arkansas, all of whom indicated they have no record of arrest for Laurence Keiswetter.

**PERSONAL AND FAMILY DATA:**

**Defendant:**

Laurence Keiswetter, age 56, was born and raised in and around the Densmore, Kansas, area. He is the second child of four born to the marital union of Richard and Iva Belva Keiswetter. Laurence Keiswetter was raised in a two parent home and was recently divorced from his wife, Carol (Smith) Keiswetter, in 1983.

[Page 7]

The defendant has lived at his present address "off and on" since 1983. He has also lived for a short time in Fort Lupton, Colorado, where he spent time "studying law" related to agricultural issues as codified in "U. S. Codes 7, 12, 15 and 42". Between 1966 through 1983 he reports living on a farm in Norton, Kansas, with his former spouse and family.

Writer has telephonically verified much of Laurence Keiswetter's family background through his sister, Delpha McCauley, who further states that Laurence Keiswetter has experienced some degree of "alienation" from his family since his divorce. She expresses support for Laurence Keiswetter and concern with regard to many of the issues that Laurence Keiswetter has had to address from 1980 on, including the loss of his farm, his divorce, the loss of a son who was murdered in November of 1985 and another son was badly injured in a car accident.

Laurence Keiswetter reports being a college graduate (University of Kansas—1959) as well as a veteran of the U.S. Navy. At the present time, he maintains financial support for himself through farming and continues to, by his own words, "study the law". He conveys to writer that he has no ties and/or associaton with any subversively organized groups including the Posse Comitatus.

## 1472

**Parents and Siblings:**

Father—Richard Keisweter, is deceased as of 1936 by polio. He was a farmer prior to his untimely death.

Mother—Iva Belva Keiswetter, age 82, is a retired homemaker living at 607 West Wilberforce in Norton, Kansas.

Brother—Leonard Keiswetter, age 57, is a farmer living in Densmore, Kansas.

Sister—Delpha McCauley, age 54, is a homemaker living in Hays, Kansas.

Brother—Billy Keiswetter, age 52, is a farmer living in Hill City, Kansas.

According to Laurence Keiswetter, none of the aforementioned family members have a prior record of arrest.

**Marital:**

Laurence Keiswetter married Carol (Smith) Keiswetter, age 50, at Denver, Colorado, on 06/07/58. Five children were produced by this union which ended by divorce in Norton, Kansas, on 06/07/83, as verified by case number 83–D–11 filed in the District Court of Norton County, Kansas.

[Page 8]

As previously mentioned, Laurence Keiswetter is the father of five children. His oldest daughter, Linda Walter, is married and now lives at 901 Crestview in Norton, Kansas. Bryan Keiswetter also lives in Norton, Kansas. In 1981, Bryan Keiswetter was involved in a car accident and sustained severe head injuries and eventually required extended medical care. Michael Keiswetter was murdered on 11/28/85 in Grand Island, Nebraska. Laurence Keiswetter states this case may have been drug related. John Keiswetter, age 24, lives at 10527 Cypress in Kansas City, Missouri. Corey Keiswetter, age 16, lives with Carol Keiswetter at 212½ Washington, Norton, Kansas.

According to Carol Keiswetter, there has been no property settlement declared in this divorce action although Laurence Keiswetter is required to make child support payments of $250 per month. There apparently have been some problems related to Laurence Keiswetter's unwillingness and/or inability to make child support payments at the present time. Laurence Keiswetter has stated to writer that he is involved with pending court action related to nonpayment of child support in Norton County, Kansas.

**Education:**

Laurence Keiswetter reports attending Hill City Memorial High School in Hill City, Kansas, where he received a high school diploma. He also reports attending and graduating from the University of Kansas in Lawrence, Kansas, on or about 1959. Writer has verified his graduation from the University of Kansas through his former spouse Carol Keiswetter. High school transcripts do reflect above average academic performance.

**Employment:**

At the present time, Laurence Keiswetter reports self-employment as a farmer since 1966. From 1961 to 1966 he reports employment as an office manager with Arnold Purtcer and Richard Dutton doing municipal work related to sewer and streets management. This company was located in Norton, Kansas, and has since gone out of business. Laurence Keiswetter indicated his reason for leaving the company was to avoid having to relocate with the company to Nevada.

Laurence Keiswetter also reports employment with the Delta Development Company of Wynne, Arkansas, in work involving the clearing "of 15,000 acres of forest. This company has since gone out of business and therefore writer is unable to verify this employment.

From 1959 to 1960, the defendant reports employment as the assistant office manager with the Humboldt Elevator Service in Humboldt, Kansas. Employment data returned to writer reflects they are unable to verify this employment since the Humboldt Elevator Service has since been sold.

The aforementioned record of employment represents the defendant's entire employment history as stated to writer.

## HEALTH:

### Physical:

For identification purposes, Laurence Keiswetter is five feet, 10 and one-half inches tall and weighs 190 pounds. He has a scar around his neck from thyroid surgery and has a tattoo on his right upper arm that depicts an eagle with scroll "USN". He reports suffering in the past from diverticulitis (colon related) and received treatment by and through the Veteran's Hospital at Grand Island, Nebraska, with the latest visit occurring on or about 05/22/87. He has no prior record of serious health history otherwise but does report taking medication for colon obstruction.

Writer has verified that Laurence Keiswetter has received medical treatment through the Veteran's Hospital of Grand Island, Nebraska, for diverticulitis and notes that he appears to be allergic to penicillin. Laurence Keiswetter has also received medical treatment through the Mary Lanning Hospital in Hastings, Nebraska, on 02/02/81 for an operation related to a total thyroidectomy with a final diagnosis of "colloid nodule of thyroid".

Writer has also verified Laurence Keiswetter's medical treatment received through Merlynn Colip from 1982 to 1983 for various problems including kidney stones.

Laurence Keiswetter also reports receiving inpatient treatment for problems related to alcohol abuse/addiction through Valley Hope Association in Norton, Kansas, on or about 1969. Medical history data returned to writer by the Valley Hope Association reflects Laurence Keiswetter's medical records have "now been destroyed". They further verify that Laurence Keiswetter was admitted to Valley Hope on 03/29/69. Laurence Keiswetter has since maintained better than 18 years of sobriety. There do not appear to be any problems related to alcohol/substance abuse at the present time.

### Mental and Emotional:

Laurence Keiswetter describes himself as "frustrated" in relationship to this particular case pending before U.S. District Court Judge Frank G. Theis at the present time. He does however believe that this matter can be successfully addressed and he is making every effort to resolve the situation. Although writer is without the benefit of a formal psychological/psychiatric evaluation, Laurence Keiswetter does present himself as an articulate and seemingly cooperative individual. By outward observation he certainly doesn't appear to suffer from any physical and/or mental impairment.

## MILITARY SERVICE:

Laurence Keiswetter has stated to writer that he served in the U.S. Navy from 12/26/50 to 10/26/54 when he received an honorable discharge as a second class petty officer. A review of his service record does not reflect any special decorations or awards and there is no record of any disciplinary actions. This record further reflects that Laurence Keiswetter received two years and eight months of sea and foreign service credit. His military service number is 3733060.

## FINANCIAL CONDITION:

Laurence Keiswetter has not yet completed a formal financial statement as previously directed to do by writer. He has conveyed various financial information by telephone to writer and has indicated that he owns approximately 520 acres of ground that he views essentially as "mortgaged property" that is now claimed by FHA. Bankruptcy evaluations were set at $52,000 (although FHA has set it at $89,000) but the amount of obligation owed to FHA is apparently $82,000 according to Laurence Keiswetter. He then indicated he has put all of his "equitable interest" (value unknown) into a trust and the Production Credit Association (PCA) has claimed an additional 90 acres valued at $4,500 as well as machinery valued at $7,500. PCA also claims a "perfected security interest" including all after acquired property.

Laurence Keiswetter stated to writer that his primary source of income is related to his "farming operation" although he could not provide writer with a specific amount of income broken down by week or month. He also has a child support obligation of $2,250 per year (or $250 per month for nine months out of each year). Additionally, Laurence

**1474**

Keiswetter indicated he is trying to "negotiate a deal" with FHA to begin making satisfactory payments toward obligations owed to FHA. 225 acres of his farm ground has been placed in the Conservation Reserve Program at the present time.

**EVALUATION:**
Laurence Keiswetter is a 56 year old divorced male who stands before the court awaiting sentencing prior to an earlier plea of guilty to a Superseding Information charging him with conversion of less than $100 of PCA property for his own use. His plea of guilty was based on **North Carolina versus Alford** and although he pled guilty he does not admit his guilt according to the government. He is a self-employed farmer since 1966.

[Page 11]

From 1980 on Laurence Keiswetter has experienced a number of personal difficulties and/or tragedies including the death of a son, a second son who was critically injured in a car accident, the apparent loss of his farm as the result of current financial hardships as well as the divorce from his former wife Carol Keiswetter. As a result, he has experienced alienation from many of his family members as well as close acquaintances. At the present time, he lives with his mother Iva Keiswetter at Norton, Kansas, although his means of support is somewhat unclear.

This particular offense involves the sale of mortgaged property (cattle) that resulted in an apparent financial gain of approximately $13,133.96 for the defendant. There is no indication that violence was threatened or used in the commission of this act and since no other party is involved, relative culpability does not appear to be a significant issue in this matter. The offense itself does appear to be indicative of persistent problems related to various financial difficulties arising from the defendant's farm operation.

In consideration of the community, writer believes the defendant does not pose a direct threat to the safety and welfare of others at the present time. There is little doubt however that should other farmers choose to engage in similar offense behavior, the financial integrity of lending institutions and communities themselves would be seriously compromised. It is not unreasonable for all persons within the community to expect their own friends and neighbors to act in a fiscally responsible manner. The economic well-being of any community is based on this important premise. In writer's opinion, long-term probation supervision would serve as a sufficient deterrent to other individuals. From the standpoint of direct benefit toward the community, probation would enable the defendant to make amends for his conduct through restitution.

Considering now the defendant, writer does believe numerous factors were significant in contributing to the defendant's current offense behavior pattern. Family/financial hardships have shaken his stability and beliefs. There is no indication of any significant history of antisocial behavior otherwise and Laurence Keiswetter has expressed motivation toward changing his behavior as reflected in the observation that he would make restitution to the victim for the full amount of loss when he is financially able to do so. Laurence Keiswetter has been a farmer for the better part of 20 years and with appropriate direction and support, he is capable of reestablishing himself as a productive member of the community. To some extent, Laurence Keiswetter has attempted to rationalize his current offense behavior as demonstrated by the statement to writer that he has pled guilty to this misdemeanor charge but does not believe he has "done anything wrong". Writer believes his paranoid attitude toward the legal system in general has contributed to a pattern of distorted impressions and misguided intentions.

[Page 12]

**SENTENCING DATA:**
Since this is a misdemeanor offense, no sentencing information is available.

Respectfully submitted,

Gary Howard

U.S. Probation Officer

APPROVED:

Arlo D. Lindsey
Senior U.S. Probation Officer

GH/cz